On April 20, 2000, the City of Birmingham ("the City") terminated the employment of Sandra Faye Dixon. Dixon appealed the termination to the Personnel Board of Jefferson County ("the Board"). The Board upheld the City's termination of Dixon's employment, and Dixon appealed to a three-judge panel in the trial court. On November 19, 2001, the trial court entered a judgment that, among other things, affirmed the Board's decision to terminate Dixon. Dixon filed a petition for a writ of certiorari in this court.
The record indicates that Dixon was employed by the City for more than 25 years. Dixon worked for a number of years for the City's community development department as a community resource officer ("CRO"), and she was then promoted to senior community resource officer ("Senior CRO"). After serving as the Senior CRO for four years, Dixon was promoted to the position of principal community resource officer ("Principal CRO"), a position she held from 1985 until January 2001.
The community development department (hereinafter "the CDD") administers a number of community and neighborhood programs. The CDD receives funding from, among other sources, the taxes imposed by the City on its residents and from the Department of Housing and Urban Development ("HUD"), which regularly awards the City community development block grants (hereinafter "the block grants"). The income standards to determine a person's or a household's eligibility for a program funded through the City's receipt of block funds from HUD are set forth at 24 C.F.R. § 570.3 (2000). Those regulations define such terms as "household," "low- and moderate-income household," and "low-income household." Dixon, in her positions with the City, oversaw the implementation of many of the City's programs that were funded by HUD.
One program administered by the CDD is the "Paint for Pride Program" (hereinafter "the PFPP"). The PFPP is designed to provide qualifying low-to-moderate-income families with free paint with which to paint the exteriors of their homes; the program is designed to improve the appearance of neighborhoods within the City. The City originally funded the PFPP, but since the early 1990s, the PFPP has been funded by block grants from HUD. In its *Page 1275 
applications for those HUD block funds to fund the PFPP, the City specified that the PFPP was a program for low-income families.
Applications for free paint under the PFPP are first submitted to a neighborhood resident who is not a City employee but who is designated by the City as a neighborhood paint coordinator. The neighborhood paint coordinators verify the information in the application and then forward the application to a CRO. The CRO, and later the Senior CRO, review and approve the applications, and then they submit the applications to the CDD's housing division, which finalizes the processing of the application.
Dixon did not work in the housing division of the CDD, and, therefore, she did not have final approval authority over PFPP applications. However, two of the CROs who consider and process the PFPP applications before they are forwarded for final approval to the housing division worked in Dixon's division and were Dixon's subordinates.
Dixon has lived with her mother, Lula Mae Taylor, for the last 25 years. In 1995, Dixon completed and signed, in her mother's name, an application for free paint under the PFPP. In 1999, Taylor completed another application for free paint under the PFPP, but Dixon signed Taylor's name to the application. It is undisputed that Taylor gave Dixon permission to complete each application on her behalf. Rather than giving the applications to a neighborhood paint coordinator, Dixon handed the applications to Sandra Jones, a CRO and one of Dixon's subordinates. Jones and Senior CRO Melvin J. McCarroll approved and processed the applications, and Taylor received paint under the PFPP in both 1995 and in 1999.
It is undisputed that in submitting the 1995 application form, and also in the 1999 application form, Dixon included only her mother's income, and not her income. The 1995 PFPP application completed by Dixon contained the following information: "GROSS INCOME $8,551.20 NUMBER IN HOUSEHOLD 1." The 1999 application contained the following information: "GROSS INCOME $801 — monthly NUMBER IN HOUSEHOLD 1." Both Jones and McCarroll admitted that they each knew that Dixon lived with her mother during the times Taylor's applications for free paint under the PFPP were under submission. It is undisputed that in the mid- to late 1990s, Dixon's salary was approximately $50,000.
In late fall of 2000, Dixon disciplined a CDD employee named Wanda Alexander for failing to attend two required meetings. Alexander sent Dixon a letter contesting the fairness of that disciplinary action and accusing Dixon of misconduct. Alexander accused Dixon of using her position to gain a financial advantage to which she was not entitled; Alexander attached the PFPP applications to her letter to Dixon. Dixon forwarded Alexander's letter to her supervisor, Dick Lindsay, and requested that Alexander's allegations be investigated.
Bill Pate and Mike Melton, both with the City's legal department, investigated the allegations against Dixon. Pate testified that he concluded that there were no clear federal regulations governing the PFPP. Pate and Melton concluded that Dixon had not violated any ethics rules.
In January 2001, while the investigation of Dixon's actions with regard to the PFPP was being conducted, Etta Dunning was hired as the director of the CDD. Dunning concluded that Dixon had used her office for personal gain. Therefore, in spite of Pate and Melton's conclusion, Dunning initiated disciplinary action against those CDD employees involved in *Page 1276 
approving Taylor's applications for the PFPP. Dunning suspended Sandra Jones for three days without pay, and she suspended Melvin McCarroll for five days without pay. Dunning terminated Dixon's employment. Dixon appealed that termination to the Board.
The Board scheduled a termination-appeal hearing, and it appointed Patricia Clotfelter as the hearing officer. Clotfelter presided over a two-day hearing. Before Clotfelter completed her report and recommendation to the Board, Dixon filed a motion seeking to have Clotfelter recuse herself from this matter. Dixon cited as the basis for that motion the fact that Clotfelter was employed by Berkowitz, Lefkovitz, Isom Kushner, a law firm that had represented the Board in an matter unrelated to this case. Out of an abundance of caution, the Board granted Dixon's motion; returned Clotfelter's report, which it had not opened; and ordered that a new hearing officer be appointed and a new hearing be conducted.
Dixon then filed with the Board a motion seeking to have Clotfelter's report and recommendation released; the Board denied that motion. John Falkenberry was appointed as the hearing officer, and Dixon filed a motion seeking his recusal. The Board denied that recusal motion. Dixon then filed a request for a subpoena duces tecum, again seeking the release of Clotfelter's report and recommendation. In response to that request, the Board entered a detailed order in which it denied Dixon's request, noted that it had not received Clotfelter's report or admitted it into the record, and found that the report would be inadmissible evidence. We note that the trial court affirmed the Board's refusal to issue a subpoena duces tecum for the release of Clotfelter's report to the Board; the trial court found that because the Board did not receive or consider that report, it was not a part of the proceeding before the Board and should not be included in the official record of the proceedings before the Board.
The hearing before hearing officer Falkenberry lasted two days. At the hearing, Dixon testified that the guidelines formulated by the City to guide the CROs in implementing the PFPP did not contain any requirement that an applicant for free paint under the PFPP include income other than that of the owner of the home to be painted. When asked whether she understood that the PFPP was a federally funded program for low-to-moderate-income families, Dixon's testimony was evasive. Dixon eventually admitted that she understood that the funding for the PFPP came from federal block grants and that all such federal grants had certain income restrictions.
Dixon also testified that the City's guidelines setting forth the manner in which eligibility for the PFPP was to be calculated did not specify that the incomes of any member of the household who contributed to household expenses should be included in determining eligibility for the program. Dixon denied that she was familiar with the HUD regulations regarding the determination of income eligibility for programs for low-income families.
It is undisputed that sometime in the year 2000, the application for the PFPP was changed to reflect that the "gross income" requested on the PFPP application form included the income of all members of a household. Dixon and McCarroll characterized the change in the 2000 application for the PFPP as a change in the PFPP program itself. However, the City maintained that the change was merely a change to the application form and that the change merely clarified the HUD regulations for income eligibility. The City maintained that the change in the form did *Page 1277 
not reflect a change in the HUD regulations themselves or in the income eligibility for the PFPP.
Dixon and McCarroll also each testified that the CDD had never defined "gross income" for the PFPP as including the incomes of all members of a household. However, both Alexander and Jones testified that the income eligibility requirements for the PFPP were discussed at annual workshops regarding the program. Alexander and Jones each testified that at those PFPP workshops they were informed that the income of all members of a household was to be included in determining a household's eligibility for the PFPP. Jones testified that Dixon coordinated and attended the PFPP workshops. Dixon admitted coordinating and scheduling the workshops, but she testified that she was only "in and out" of the workshops.
Much of McCarroll's testimony supported Dixon's testimony and the position Dixon took in this matter. McCarroll testified that he actually coordinated the PFPP, but that he was not aware that eligibility for the program was dictated by federal regulations. McCarroll had worked for the City for approximately 11 years; he denied ever seeing the HUD regulations before this dispute arose. We note that McCarroll later testified that in coordinating the PFPP he follows the HUD regulations and that he knew that the PFPP was a HUD program. McCarroll first denied realizing when he reviewed Taylor's application that the Taylor completing the application was the Taylor who was Dixon's mother; some of his later testimony called that assertion into question. McCarroll also testified that he had known Dixon for 25 to 30 years. He testified that Dixon did not contribute financially to her mother's household, but he stated that Dixon had given her mother "gifts" on occasion. At the close of McCarroll's testimony, the hearing officer stated that he found McCarroll's testimony to lack credibility.
In his report to the Board, the hearing officer made detailed findings of fact. He found that McCarroll's testimony was "evasive and deceptive." The hearing officer also found Dixon's testimony to lack credibility, and he cited several instances in which he found Dixon's testimony to lack "forthrightness." We also note that Dixon's explanation of her conduct with regard to the PFPP application changed during the course of the City's investigation. In his report to the Board, the hearing officer concluded that the testimony of Jones and Alexander that the workshops included specific instructions on calculating total household income for the purposes of qualification for the PFPP was credible. The hearing officer concluded that "Dixon knowingly and wilfully misrepresented essential facts on both the 1995 and 1999 [PFPP] applications, and that she used her official position unlawfully to obtain a personal benefit." The hearing officer recommended that the decision to terminate Dixon's employment not be overruled. The Board accepted the recommendation of the hearing officer, and it sustained the termination of Dixon's employment. Dixon appealed to the trial court, which, among other things, affirmed the decision of the Board.
Act No. 679, Ala. Acts 1977, which governs the manner in which the Board operates, provides, in part, that "[t]he opinion of a majority of three judges to whom such case is assigned shall be determinative of the case and there shall be no appeal to any appellate court of Alabama." However, Dixon is not without remedy in the appellate courts; Dixon may file a petition for a writ of certiorari in this court. § 12-3-11, Ala. Code 1975; Evans v. City of Huntsville, 580 So.2d 1323 (Ala. *Page 1278 
1991); Ex parte Jackson, 733 So.2d 456 (Ala.Civ.App. 1999); Ex partePersonnel Bd. of Jefferson County, 440 So.2d 1106 (Ala.Civ.App. 1983); Exparte Smith, 394 So.2d 45 (Ala.Civ.App. 1981). "Under the appropriate standard of review for cases before this court on certiorari, this court is limited to a review of whether the circuit court properly applied the law and whether the decision is supported by any legal evidence." Exparte Jackson, 733 So.2d at 457. Our supreme court has also held that in addition to the foregoing, the trial court must review the record to ensure that there had been no violation of a party's fundamental rights.Evans v. City of Huntsville, supra. The scope of appellate review of administrative actions is narrow; therefore, "[t]he determination of the weight and credibility of the evidence presented is solely within the province of the Board." Ex parte Personnel Bd. of Jefferson County,440 So.2d at 1109.
Dixon first argues that the trial court applied an improper standard in reviewing this matter because, she alleges, it failed to ensure that her fundamental rights, particularly her due process rights, were not violated. See Evans v. City of Huntsville, supra. Dixon briefly states that the trial court's judgment should be reversed because, she says, the trial court "limited" its review and did not consider whether her fundamental rights were violated during the course of the proceedings below. This court's review of the transcript and the trial court's judgment does not, however, support her contention. In her brief submitted to this court, Dixon does not specify how the trial court "limited" its consideration of whether her fundamental rights were violated. It is not the function of this court to create an argument for an appellant. McLemore v. Fleming, 604 So.2d 353 (Ala. 1992).
In her brief on appeal, Dixon asserts four issues related to purported violations of her constitutional rights. Dixon argues that her termination violated her due process rights because, she alleges, there were "no clear rules" determining income eligibility for the PFPP. She also contends that the City's legal department had exclusive authority to determine whether she had violated certain ethics laws, and that because the members of the legal department concluded she had violated no ethics laws, the City, by disregarding those opinions, violated her due process rights. Dixon also argues that because she did not have final approving authority over the PFPP applications, the Board violated her due process rights by punishing her "for conduct attributable to others." Dixon did not raise these due-process issues before the trial court. This court may not consider issues raised for the first time on appeal. Abbott v.Hurst, 643 So.2d 589 (Ala. 1994).
Dixon did, however, raise before the trial court the issue whether the City impermissibly and retroactively applied a "new" rule against her. Dixon alleged that the City only formally "implemented" the HUD guidelines for income eligibility for the PFPP in 2000, and that that purported implementation constituted a change from the manner in which the PFPP had been implemented in prior years. However, both the Board and the trial court resolved this issue against Dixon, and we conclude that the record supports that determination. Dixon's testimony indicates that Dixon was aware that the PFPP was a federally funded program and that the federal regulations would dictate income eligibility for programs such as the PFPP, which were designed for low-to-moderate-income families. It is undisputed that the federal regulations, which require that the incomes of all members of a household be included in determining income eligibility *Page 1279 
for a program, have not changed. Rather, the City's guidelines for the CCD's implementation of the PFPP, which are apparently derived from the applicable federal regulations, were changed in 2000 to specifically state that income of all household members is to be considered in determining a family's eligibility for the PFPP. Further, Dixon worked in a supervisory capacity; her job duties included overseeing the implementation of many federally funded programs such as the PFPP. The evidence presented to the hearing officer would support a conclusion that Dixon knew or should have known that because she was a member of Taylor's household, she was required to include her own income in her mother's application for free paint under the PFPP.
After considering all of the evidence, the hearing officer found that Dixon knew or should have known that the federal regulations governed the PFPP and that those regulations required the inclusion of the incomes of all members of a household in determining income eligibility for the PFPP. The trial court reviewed all of the evidence before the hearing officer and heard the arguments of counsel; it found that there was "substantial and legal evidence" to support the Board's determination. Likewise, we conclude that the trial court's determination is supported by the evidence. Dixon has failed to demonstrate that the rules that govern the PFPP changed. Therefore, Dixon's argument that she was terminated as a result of a retroactive rule change is without merit.
Similarly, we reject Dixon's argument that "there was no clear rule" regarding the eligibility criteria for the PFPP, and, therefore, that she should not have been terminated for violating that rule. The evidence in the record supports a conclusion that Dixon knew, as a function of her job, that the PFPP was a federally funded program for low-income households, and that federal regulations defined income eligibility for programs such as the PFPP. The hearing officer found that Dixon knew or should have known that HUD regulations set forth at 24 C.F.R. § 570.3
(2000), governed the income eligibility for the PFPP. Given the evidence in the record, particularly with regard to Dixon's job duties, we cannot say that the trial court's judgment is unsupported by the legal evidence. See Ex parte Jackson, supra.
Dixon also contends that the City's "Standard of Conduct" provides that only the City's legal department could determine whether an employee had violated an ethics rule. The Standard of Conduct is an executive order issued by the City's mayor. Dixon cites a provision of that Standard of Conduct that provides that if a violation is not resolved to the satisfaction of one of the legal department's staff, that staff member must report the violation to the employee's supervisor. Dixon apparently contends that because members of the legal department concluded that she had not violated "a clear rule," that determination should have ended the matter. However, nothing in the Standard of Conduct provides that members of the City's legal department have the sole decision-making authority regarding whether to terminate an employee's employment. Further, Dixon has cited no supporting legal authority for her argument on this issue. We cannot say that Dixon's argument as to this issue has merit or that the trial court misapplied the law in rejecting this argument. See Exparte Jackson, supra.
Dixon contends that the HUD regulations were not provided to her, and that those regulations did not clearly indicate that the incomes of all members of a household must be considered in determining whether a family or household *Page 1280 
qualified for programs designed for low-income families. In her brief on this issue, Dixon quotes only portions of those federal regulations; in her brief on appeal, Dixon omits the definition of "low-and moderate-income household," as distinguished from "low-and moderate-income person," as those terms are defined and set forth in the federal regulations. See 24 C.F.R. § 570.3 (2000). Those regulations clearly define "low-income household" as "a household having an income equal to or less than the Section 8 very low-income limit established by HUD." Further, during the hearing in this matter, Dixon testified that she was familiar with the definitions in the federal regulations of low-and-moderate-income households, but that she did not "understand" that those definitions applied to determine income eligibility for the PFPP.
We also note that, as a part of this issue, Dixon argues that the same federal regulations she initially contended did not apply during the times she submitted the 1995 and 1999 PFPP applications provide that "not less than 60% of the [federal block grant] funds" are to be used for low-to-moderate income households. She does not specifically make the argument, but apparently Dixon is contending that the remaining federal block funds may be used for non-low-income households. However, the undisputed evidence presented at the hearing indicated that the City's application for those block funds designated the City's use of those funds only for low-income households. Thus, the City's own operation of its PFPP limited the program to low-income families. We conclude that Dixon has failed to demonstrate error with regard to this issue.
Dixon also argues that the hearing officer was possibly biased against her and that the Board and the trial court erred in not requiring him to recuse himself from this matter. Dixon alleges that the hearing officer was biased against her because he had testified "against" her attorney in a previous litigation matter, and because her attorney, during the course of that litigation, had criticized the hearing officer. We note that Dixon filed her motion to recuse the hearing officer with the Board, and the Board denied that motion. During the course of the proceedings before the hearing officer, Dixon did not mention the issue of recusal, and she did not argue this issue before the trial court. Other than the allegations in Dixon's motion to recuse, there is no evidence in the record with regard to the previous interaction between Dixon's attorney and the hearing officer. Out of an abundance of caution, however, we briefly address this issue.
The party seeking the recusal of a judge has the burden of presenting evidence indicating that the judge is biased. Henderson v. G G Corp.,582 So.2d 529 (Ala. 1991). The presumption is that a judge is not biased. Id.; Rikard v. Rikard, 590 So.2d 300 (Ala.Civ.App. 1991). "[R]ecusal is not required by a mere accusation of bias unsupported by substantial fact." Acromag-Viking, Inc. v. Blalock, 420 So.2d 60, 61
(Ala. 1982).
In Henderson v. G G Corp., supra, the plaintiff filed a motion seeking the recusal of the trial judge; the plaintiff alleged that the trial judge was biased because he had testified against the plaintiff's attorney in another litigation matter. In that case, the plaintiff's attorney submitted an affidavit contradicting another attorney's affidavit regarding a discovery issue; the trial court resolved the dispute against the plaintiff's attorney. The supreme court affirmed the denial of the motion to recuse, holding that adverse rulings alone were not sufficient to establish bias or prejudice on the part of the trial court. Henderson v. G G Corp., 582 So.2d at 530-31. *Page 1281 
In this case, Dixon merely alleges that because the hearing officer had, at some point in time, testified as a witness in a proceeding involving her attorney, he was biased. However, there is no evidence in the record to support her assertion that the hearing officer "has a personal ax to grind" against her attorney. This court has reviewed the entire, lengthy transcript of the proceedings before the hearing officer, and that transcript does not indicate any instance of bias or prejudice on the part of the hearing officer against Dixon or her attorney. Dixon herself has not identified any instance in which she contends the hearing officer's conduct during the proceedings before him indicated any type of prejudice or bias against her. We cannot say that Dixon's mere allegation that the hearing officer "had a personal ax to grind" against her attorney amounted to a showing of bias or prejudice.See Henderson v. G G Corp., supra.
Dixon has failed to demonstrate that the trial court erred in affirming the Board's termination decision; therefore, the trial court's judgment is affirmed.
AFFIRMED.
YATES, P.J., and CRAWLEY and PITTMAN, JJ., concur.