PER CURIAM.
Michael Key petitions this court for a common-law writ of certiorari, seeking review of the decision of the Jefferson Circuit Court ("the circuit court") affirming an order of the Jefferson County Personnel Board ("the Personnel Board"). The Personnel Board's order suspended Key for 30 days without pay from his position as a police officer for the City of Irondale. Key's suspension was based on an allegation that Key had used excessive force against an inmate ("the inmate") in the Irondale City Jail. The Personnel Board, however, made an express factual finding in its order that Key's actions were "necessary to further restrain the [inmate], who subsequent to being restrained, continued to engage in conduct that could be deemed disruptive and could have potentially endangered the officers present." Key's suspension is inconsistent with this express factual finding and, therefore, lacks reasonable justification. Therefore, we grant the petition and reverse the circuit court's decision.
Facts and Procedural History
As previously indicated, Key is a law-enforcement officer with the City of Irondale *289 ("Irondale"). On April 9, 2015, Irondale police officers, including Key, acted to restrain and control the inmate in the Irondale City Jail. The incident was recorded with the video cameras in the jail. On May 6, 2015, Lt. Jason Wiggins, the interim chief of police of Irondale, sent a notice to Key that he was being placed on administrative leave. The notice stated the following factual basis for the disciplinary action:
"It has come to my attention that on or about Thursday, April 9, 2015, you were recorded physically assaulting a prisoner in the Irondale jail. Specifically, you were recorded striking said prisoner repeatedly in the face. It is my understanding that at the time this incident took place, the prisoner was restrained and posed no threat of physical harm to you, other officers, or civilians, it is also my understanding that as a result of your actions the prisoner suffered a broken jaw.
"You were also recorded using a taser on a restrained subject."
On May 22, 2015, Wiggins sent Key notice of his decision to suspend him for 60 days without pay. As grounds for the suspension, Wiggins found that Key's actions violated the Irondale Use of Force Policy regarding the use of excessive force, the use of a Taser weapon against a restrained subject, and the use of a Taser weapon by an uncertified user. Wiggins also found that Key had demonstrated the following causes for disciplinary action under Jefferson County Personnel Board Rule 12.2: conduct unbecoming of a classified employee (Rule 12.2(c)); incompetence and inefficiency (Rule 12.2(g)); neglect of duty (Rule 12.2(j)); and any other legitimate and nondiscriminatory reason that constitutes good cause for disciplinary action (Rule 12.2(p)).
The Irondale Use of Force Policy provides the guidelines and procedures restricting the use of excessive force. Under the policy, police officers are authorized to use force "[t]o protect themselves and/or from physical attack" or "[t]o maintain order in the jail." The policy further provides:
"The officer's use of force must be reasonable and appropriate to the situation. An officer will only use the amount of force that is necessary to bring a situation under control. An officer must exercise their discretion and judgment when using force. Officers will only use weapons ... that the officer has been qualified in and are departmentally approved.
"An officer should always attempt to resolve any situation with the least amount of force necessary to effectively bring the situation under control. An officer should always exercise restraint, discretion, and good judgment. However, it is primarily the action(s) of the subject(s) and/or the totality of the circumstances that determine what level of force is to be used...."
The policy authorizes the use of a Taser weapon for the following purposes:
"1. To repel human and/or animal attacks
"2. To temporarily incapacitate violently resisting subjects
"3. To defend other officers and/or citizens
"4. To maintain order in the jail or to subdue a violent inmate or arrestee when lesser means of control have failed. The Taser is not to be used on an inmate/arrestee who is only being loud, boisterous, etc."
The policy specifies that "[o]fficers will not use the taser on subjects who are under physical restraint unless the subject(s) are still violently resisting and lesser means of controlling the subject(s) [have] failed."
*290 It is undisputed that Key's employment was subject to the Jefferson County Personnel Board Rules and Regulations. On May 26, 2015, Key appealed his suspension to the Personnel Board. The Personnel Board appointed a hearing officer who conducted a hearing on August 27, 2015.[1] On September 22, 2015, the hearing officer submitted a report and recommendation to the Personnel Board, which contained findings of fact and conclusions of law and recommended that the Personnel Board uphold the 60-day suspension without pay. The hearing officer provided the following summary of the testimony:
"1. Lieutenant Jason Wiggins: A report had been received by Lt. Wiggins about a disruptive and unruly inmate at the [Irondale] City Jail, who had been taken into custody after causing a disturbance in the municipal court. Lt. Wiggins explained that when he visited the jail on that occasion, he found that particular inmate in the holding area. Several other officers and a senior lead magistrate were also present at that time. The inmate expressed displeasure about, among other things, not being transported to the County Jail for processing.
"Shortly thereafter, Lt. Wiggins, who was also serving as the Interim Chief of Police at that time, left the [Irondale] City Jail to attend an employee appreciation banquet. He later received a call, as well as possibly a text message, from [Key] that the inmate was combative and needed to be placed in a restraint chair. Based on what he was aware of at the time, Lt. Wiggins had no problem with how the inmate had been treated, but he later learned that the inmate was taken to a hospital after having been tased earlier that evening by someone.
"Whenever a use of force occurs at the jail, a review is routinely undertaken relative to how such force was exercised. So he proceeded to locate the video recording of what had occurred. When he succeeded in doing so, after initially encountering some difficulty, what he saw concerned him because it appeared that an excessive amount of force had been used against the inmate. After discussing what had occurred, an incident report was prepared that led to a recommendation that [Key] be placed on administrative leave with pay.
"What seemed to bother Lt. Wiggins, after he had viewed the video recording of the incident, was that even though a de-escalation of the situation was underway, a taser had been used on the inmate while he had been restrained in the chair. "The police department's Use of Force Review Committee later reviewed the video recording, and determined that a 60-day suspension for Officer Key was appropriate disciplinary action for the excessive use of force that had been exercised by him against the inmate.
"During cross-examination, it was admitted by Lt. Wiggins that the inmate had also kicked a door open at the jail that struck another officer who was involved. Moreover, the inmate had spat at officers that night, as well as causing human waste to spill onto the floor of his jail cell. At that time, he further acknowledged, *291 spit masks were not available to the officers who had been assigned to the jail.
"Nonetheless, Lt. Wiggins maintained that Officer Key had been suspended simply because he exercised an excessive level of force against the inmate that was in violation of the department's policy guidelines.
"In any event, Lt. Wiggins never denied that he had initially expressed his approval of how the inmate had been treated by [Key] and his fellow officers. It was only after he had the opportunity to view the video recording that he changed his mind about what had occurred. Because of that, he reached the conclusion that the tasing of the inmate had not been necessary.
"2. Lieutenant Paul Kellogg: Lt. Kellogg was primarily responsible for the operation of the [Irondale] City Jail at that time. As such, he learned after the fact that one of the prisoners had suffered a physical injury. While initially everything seemed routine to him about how the matter was handled, after Lt. Wiggins shared a video recording of what had occurred at the jail when the prisoner was injured, an investigation was initiated soon after the recording had been reviewed by the two (2) of them. An Abuse of Force Review Committee was then organized for the purpose of more closely examining what had occurred. That committee assessed the response of [Key] to [the inmate] because of his unruly and disruptive, and even hostile, behavior.
"According to Lt. Kellogg, circumstances typically dictate how much physical force an officer should utilize in any specific situation with attention to whether there is an escalation or de-escalation of relevant conditions. Sometimes the use of a taser could be appropriate, even when a subject has been restrained, if a properly trained officer is on the scene. Moreover, even a mere verbal threat, when accompanied by the ability to violently resist on the part of a subject, can warrant a response that entails the use of physical force. Ultimately, the Use of Force Review Committee determined that the three (3) blows delivered to the subject's head by Officer Key's elbow or triceps while [the inmate] had been restrained were excessive.
"During cross-examination, however, he conceded that the use of force standards from federal case law applied to street responses on the part of the officers rather than in a jail setting. He went on to confirm how the inmate had repeatedly spat at officers on duty at the jail, as well as causing human waste to flood onto the floor of his cell and beyond it. He recalled also how the inmate had claimed that he [had] tuberculosis. Additionally, a door at the jail had been kicked open by the inmate with enough force to cause it to strike another officer. Lt. Kellogg went on to testify that the inmate had stuffed clothing into the toilet in his cell, which had caused it to overflow.
"When asked about the use of tasers, he acknowledged that the standards promulgated by the department were more appropriate for the use of such devices on the street rather than in a jail setting, and that those standards may not be appropriate for use of a taser at the jail.
"He confirmed, as well, that spit masks were not available to the officers that had been on duty at the jail on that occasion, and that the restraint chair that had been used would not fit in the inmate's cell. When asked his opinion about how Officer Key reacted on that *292 occasion, he described his reaction as having been merely unreasonable, rather than malicious or sadistic.
"Notwithstanding his view about Officer Key's behavior in this particular instance, he described him overall as being an exemplary officer. He went on to explain that, in trying to arrive at an appropriate level of discipline, the committee settled on a 60-day suspension in an effort to avoid the possible termination of his employment for such misconduct.
"To Lt. Kellogg, Officer Key appeared to have misinterpreted the inmate's actions.
"3. Mayor Tommy Joe Alexander: After being informed of respective 45-day and 60-day suspension recommendations for [Key], Mayor Alexander took it upon himself to make available to the City Council the video recording of what had occurred at the jail. He did so because he did not want any of them to have simply come across it while browsing the Internet. The timing of the incident had also been a concern, as well, because of other widely publicized incidents involving excessive use of force by local law enforcement personnel in other states.
"Mayor Alexander, after reviewing the video recording, therefore concluded that a 60-day suspension was the most appropriate disciplinary action that could be imposed. He reached this decision based, in great part, on his past experience as a law enforcement officer. While [Key] had a good service record overall, he considered the three (3) blows that were struck, along with the drive stuns inflicted by the taser, to have been excessive and evidence of malice aforethought. Nor did the provisions contained in § 14-6-95, [Ala. Code ] 1975, relative to the maintenance and supervision of local jails cause him to have any second thoughts about his decision. Because [Key] had lost his temper and poise, he believed that an admittedly serious measure of disciplinary action was in order.
"4. Mr. Ronald Kiker: The last witness to testify was [Key's] law enforcement consultant, Mr. Kiker, who was a paid expert. In his testimony, Mr. Kiker noted that under federal jurisprudence with respect to the Fourth, Eighth, and Fourteenth amendments to the federal Constitution, different standards are applied in determining the permissible levels of force to be exercised by law enforcement officers. According to him, when officers come into contact with members of the general public on the street, federal courts typically measure the level of force on their part under Fourth Amendment standards. And in those types of situations, federal courts seem to most often search for a standard of reasonableness. But in jail or prison settings, federal courts more typically look to Eighth Amendment standards relative to the infliction of cruel and unusual punishment, or those of the Fourteenth Amendment relative to equal treatment. Mr. Kiker went on to say that in jail or prison settings, more lenient standards have been applied under those two amendments because federal courts have recognized a greater need to maintain control and order in that type of environment.
"His basic criticism of the Use of Force and Firearm Procedures promulgated by the Irondale Police Department is that they adopt standards more appropriate for street situations rather than in the jail. Instead, he maintained, more lenient use of force standards need to be employed for the jail so as to allow for self-defense measures that do not constitute the wanton infliction of physical *293 pain, or malicious or sadistic forms of behavior. For these reasons, Mr. Kiker concluded, the use of force standards employed by [Irondale] are in need of updating.
"Moreover, even though there was at least one prior occasion when [Key] had operated a taser after his certification had expired, he was not the subject of any disciplinary action at that time. As on this occasion, Sgt. [Mark] Meadows and Sgt. [Kyle] Robertson had been responsible for the review of that situation.
"Apparently, according to Mr. Kiker, [Key] had been trained on how to use a restraint chair, but never obtained any formal certification for such. He concluded, as well, that § 14-6-95, [Ala. Code ] 1975, could be enforced in any way that did not violate either the Eighth or Fourteenth amendments under federal jurisprudence."
The hearing officer made the following conclusions:
"Unfortunately for [Key] and the other officers who were on duty at the jail on the evening of April 9, 2015, an extraordinarily uncooperative inmate had to be taken into custody during their shift. As the reports received as evidence during the hearing on the merits, as well as the video recordings, tend to substantiate, the misbehavior on the part of [the inmate], that was likely criminal in nature, on that day led to him being physically restrained in a chair from which he was not allowed to rise up on his own.
"While [Key] and the other officers on duty were clearly justified in exercising that level of force to maintain order and discipline at [Irondale's] jail, what has become an issue at this point in time is whether the violent physical blows inflicted by [Key], along with the drive stuns of the taser he had in his possession at the time, amounted to a use of force that was unnecessary and excessive.
"It is maintained by [Key] that even though the inmate had been bound in the restraint chair, he was still able to maneuver the chair into different areas of the jail, wiggle his arms and legs to a limited degree, and project spittle at nearby jail personnel as they tried to control him, all the while claiming that he had been infected with tuberculosis. To that extent, at least, there is no dispute between the parties in these proceedings.
"What there is a dispute about, however, is whether [Key] was justified in striking the inmate repeatedly with his elbow and/or his triceps and applying drive stuns to his neck and/or head. These actions, the Complainant [i.e., Irondale Police Department] maintains, constituted excessive force on the part of [Key] that was not necessary to control the inmate's behavior.
"Fortunately, a video recording of many of the events that occurred at the jail on the evening of April 9th is included in the evidence received as Complainant's Exhibit 3. The Hearing Officer finds that Exhibit 3 serves to establish, by a preponderance of evidence that Rules 12.2(c), (g), (t), and (p), as well as the Department's Use of Force Policy, were violated by [Key].
"The Hearing Officer therefore concludes that, while the actions of [Key] were not sadistic or malicious, they were, at the very least, reckless in their nature. It is likely, as Mayor Alexander observed, that on this particular occasion an officer with a good overall record nonetheless lost his composure and let his temper get the better of him in dealing with an undeniably difficult inmate.
*294 It may, in any event, be in [Irondale's] interest to review and update its use of force policies, as suggested by Mr. Kiker, to better reduce the prospects for litigation to ensue when someone like this particular inmate may be taken into custody sometime in the future.
"But the Hearing Officer is not persuaded, nor did Mr. Kiker assert, that anything prevents [Irondale] from developing standards of conduct for law enforcement officers that exceed whatever may have been established as minimally acceptable for such conduct to pass constitutional muster under the Eighth and Fourteenth amendments, and, in doing so, may well see fit to expect even more professional behavior that exceeds whatever is even required by the Fourth Amendment under federal jurisprudence.
"While [Key] was also in violation of the Department's policies relative to the use of taser devices, as charged, those violations are of only minor significance, particularly because of the undisputed evidence of [Irondale's] past failure to adhere to the provisions contained therein."
On September 24, 2015, Key filed objections to the hearing officer's recommendation. Among other contentions, Key argued that the testimony presented by his expert witness, Ronald Kiker, had exonerated him. At the hearing, Kiker had testified that the inmate was taken into custody in the municipal court for throwing a vase at the judge in a proceeding; that the inmate threatened the judge and police officers; that the inmate punched the walls in the booking room; that the inmate flooded his jail cell with water, urine, and feces from the toilet; that the inmate slung water outside the bars of his cell; and that the inmate was placed in a restraining chair while the police officers cleaned his cell. According to Kiker's testimony, the inmate was not completely restrained in the chair; the inmate was able to pull down his pants and defecate; the inmate began spitting at officers while claiming to have AIDS, hepatitis C, and tuberculosis ; and the officers did not have spit masks for protection. Kiker testified that, after the spitting began, Key gave the inmate oral directions and then applied pressure points to the inmate's neck to gain control. Kiker testified that the inmate continued spitting and that, in response, Key delivered three strikes to the inmate's head in a manner he had been taught as a defensive tactic while another officer stunned the inmate with a Taser weapon. Kiker testified that later the inmate again struggled against the restraints and possibly threatened or attempted to spit at Key, who then used a Taser weapon to stun the inmate until he became compliant. According to Kiker, Key's actions were necessary to control the inmate.
On October 13, 2015, the Personnel Board entered an order, stating:
"This matter is before [the Personnel Board] on the September 22, 2015, Hearing Officer's Findings of Fact and Law and Recommended Decision and [Key's] Objections to the Hearing Officer's Recommended Decision filed September 24, 2015.... The Hearing Officer found that there was sufficient basis for [Irondale] to suspend Respondent Key for 60 days without pay, for violation of [Irondale's] Use of Force Policy and Personnel Board Rule 12.2(c), (g), (j), and (p). Upon due consideration of all relevant parts of the record, [the Personnel Board] MODIFIES the Hearing Officer's Recommendation to uphold the 60-day suspension without pay, and instead reduces the suspension to thirty *295 (30) days without pay from May 26, 2015 through June 25, 2015."
"[The Personnel Board's] decision to modify the Recommended Decision is based upon finding that the actions of Respondent Key were necessary to further restrain the prisoner, who subsequent to being restrained, continued to engage in conduct that could be deemed disruptive and could have potentially endangered the officers present."
(Capitalization in original.)
The legislation that established the Personnel Board provides that such orders of the Personnel Board may be appealed by either party to the circuit court where the appeal shall be heard before a panel of three judges.[2] On October 20, 2015, Key filed an appeal of the Personnel Board's order to the circuit court, and the appeal was heard before a three-judge panel in the circuit court. On May 26, 2016, the circuit court entered an order upholding the decision of the Personnel Board. In its order, the circuit court referred to the deferential standard of review applicable to personnel-board determinations and held that substantial legal evidence supported the Personnel Board's decision.
On December 14, 2016, Key filed a petition for a writ of certiorari to this court. In addition to the parties' briefs on the issues, we requested and received letter briefs from the parties regarding whether the petition for a writ of certiorari had been timely filed.
Discussion
We first consider the contentions of Irondale and the Personnel Board that Key's common-law petition for the writ of certiorari to this court was untimely filed.[3] "Section 22 of [Act No. 248, Ala. Acts 1945, as amended] provides that in appeals to the circuit court from adverse rulings of the [Personnel] Board, 'there shall be no appeal to any appellate court of Alabama.' " Ex parte Chambers, 137 So.3d 912, 915 (Ala. Civ. App. 2013). " ' "[T]he proper method of reviewing circuit court decisions involving appeals from the Jefferson County Personnel Board is by common-law petition for writ of certiorari." ' " Ex parte Jefferson Cty. Sheriff's Dep't, 13 So.3d 993, 995 (Ala. Civ. App. 2009) (quoting Ex parte City of Birmingham, 992 So.2d 30, 32 (Ala. Civ. App. 2008), quoting in turn Ex parte Personnel Bd. of Jefferson Cty., 513 So.2d 1029, 1031 (Ala. Civ. App. 1987) ). This court is the proper forum for such a petition pursuant to § 12-3-10 and -11, Ala. Code 1975. See e.g., Ex parte Dixon, 841 So.2d 1273, 1277 (Ala. Civ. App. 2002) ; Ex parte Smith, 394 So.2d 45, 47 (Ala. Civ. App. 1981) (holding that Court of Civil Appeals has jurisdiction over petitions for a writ of certiorari involving the orders of the Personnel Board, which is an administrative agency).
Now that we have determined that Key's petition for the writ of certiorari is the proper means to seek a review in this case, we address whether the petition was timely filed. Irondale and the Personnel Board argue that the petition is subject to the timeliness requirement in Rule 21(a)(3), Ala. R. App. P., which provides:
"The petition shall be filed within a reasonable time. The presumptively reasonable time for filing a petition seeking review of an order of a trial court or of a *296 lower appellate court shall be the same as the time for taking an appeal. If a petition is filed outside this presumptively reasonable time, it shall include a statement of circumstances constituting good cause for the appellate court to consider the petition, notwithstanding that it was filed beyond the presumptively reasonable time."
Irondale and the Personnel Board argue that Key's petition should have been filed within the same time for taking an appeal of the order, or within 42 days of the entry of the circuit court's order, under Rule 4(a)(1), Ala. R. App. P.
Rule 21(a)(3) specifically pertains to petitions for a writ of mandamus or of prohibition. Committee Comments to Amendments to Rule 21(a) and 21(e)(4) Effective September 1, 2000 ("The amendment to subsection (a) adds three sentences relating to the time allowed for filing a petition for the writ of mandamus or prohibition; its effect is to incorporate into the Rules of Appellate Procedure the requirement that a petition for a writ of mandamus or prohibition be filed within a reasonable time."). The timeliness requirement of Rule 21(a)(3) applies to petitions for other extraordinary writs through Rule 21(c), Ala. R. App. P., which provides:
"Application for extraordinary writs other than those provided for in subdivisions (a) and (b) of this rule shall be made by petition filed with the clerk of the appellate court having jurisdiction thereof with proof of service on the parties named as respondents. Except in the Court of Criminal Appeals, the petition shall be accompanied with payment of the docket fee as prescribed in Rule 35A[, Ala. R. App. P.] Proceedings on such application shall conform, so far as is practicable, to the procedure prescribed in subdivisions (a) and (b) of this rule."
We note that Key filed his petition 202 days after the entry of the circuit court's order without providing a statement of circumstances constituting good cause for a belated filing pursuant to Rule 21(a)(3).
Rule 21(e)(4), Ala. R. App. P., however, excludes certain cases from the purview of Rule 21, providing, in pertinent part:
"The term 'extraordinary writ' within the meaning of this rule encompasses the situation where a party seeks emergency and immediate appellate review of an order that is otherwise interlocutory and not appealable. This rule does not apply to those cases where review in a court of appeals is normally had by way of an extraordinary writ. Such excluded cases include ... review of decisions of the three-judge Jefferson County panel or decisions of the Jefferson County Personnel Board...."
(Emphasis added.) But see Bell v. State, 217 So. 3d 962, 963 (Ala. Crim. App. 2016) (stating that Rule 21(c) should apply to a petition for a writ of certiorari to the Court of Criminal Appeals). Key's petition is not directed to an interlocutory order of the circuit court but, rather, is directed to a final order and is the only means by which the order may be reviewed by this court. Therefore, the petition for the writ of certiorari is the means by which review is "normally had" in these types of cases and does not seek "emergency and immediate appellate review." Rule 21(e)(4).
Although Rule 21(e)(4) is included within subsection (e) titled "Review in Supreme Court of Decisions of Courts of Appeals," the supreme court has consistently quoted language in Rule 21(e)(4) to refer generally to any petition for an extraordinary writ in an appellate court, not just petitions in the supreme court seeking review after a lower appellate court has issued a decision. See, e.g., *297 Kappa Sigma Fraternity v. Price-Williams, 40 So.3d 683, 692 (Ala. 2009) (stating that Rule 21(c) and Rule 21(e)(4) allow "a party to apply for an extraordinary writ where the 'party seeks emergency and immediate appellate review' " of a trial court's order); Ex parte Brookwood Med. Ctr., 994 So.2d 264, 268 (Ala. 2008) ("Mandamus is an extraordinary writ by which 'a party seeks emergency and immediate appellate review of an order that is otherwise interlocutory and not appealable.' Rule 21(e)(4), Ala. R. App. P."). Given the plain meaning of the terms used in Rule 21(e)(4), we conclude that no provision of Rule 21 applies to petitions for the writ of certiorari to review decisions of the Personnel Board.
" 'We start with the basic premise that words used in court rules must be given their plain meaning.' Nieto v. State, 842 So.2d 748, 749 (Ala. Crim. App. 2002). In construing a rule promulgated by this Court, effect must be given to 'each word, phrase, and clause.' State v. Old West Bonding Co., 203 Ariz. 468, 471, 56 P.3d 42, 45 (Ct. App. 2002)."
Southeastern Meats of Pelham, Inc. v. City of Birmingham, 895 So.2d 909, 913 (Ala. 2004).
Moreover, we observe that the requirement of filing a petition within a presumptively reasonable time in Rule 21(a)(3) was added at the same time that Rule 21(e)(4) was modified to replace references unrelated to this type of case. Committee Comments to Amendments to Rule 21(a) and 21(e)(4) Effective September 1, 2000. Because the exclusion of petitions seeking "review of decisions of the three-judge Jefferson County panel or decisions of the Jefferson County Personnel Board" was retained in Rule 21(e)(4), the addition of the timeliness requirement in Rule 21(a)(3) does not appear to have been intended to apply to the types of cases excluded by Rule 21(e)(4). We therefore conclude that Rule 21(a)(3) does not apply to this petition.
We determine that the legal authority governing the timeliness of a common-law petition for a writ of certiorari remains the holding in Ex parte Smith, 394 So.2d 45, 48 (Ala. Civ. App. 1981), in which this court stated:
"[M]ere delay in filing a petition for a common law writ of certiorari is not a sufficient defense, Byars v. Town of Boaz, 229 Ala. 22, 155 So. 383 (1934). Such a petition should not be dismissed on grounds of delay unless the delay makes it unjust or unreasonable to grant the relief sought. Rudolph v. Rudolph, 251 Ala. 317, 36 So.2d 902 (1948)."
Irondale and the Personnel Board do not provide any reasons why Key's 202-day delay in filing this petition has created an unjust or unreasonable situation that would preclude granting Key the relief he seeks. We therefore proceed to review the decision of the three-judge panel of the circuit court.
Key argues that the circuit court should have found that the Personnel Board's order was unreasonable and arbitrary because he was suspended based on allegations of excessive force, but the Personnel Board expressly found that his actions were necessary to restrain the inmate. Irondale and the Personnel Board both argue that the circuit court properly affirmed the Personnel Board's order because, they assert, the order is supported by substantial evidence. Citing Ex parte Personnel Board of Jefferson County, 440 So.2d 1106 (Ala. Civ. App. 1983), Irondale asserts that, because this court's review "is limited to [determining] ... whether the ruling is supported by any legal evidence," we may disregard the Personnel Board's articulation for its decision as long as any legal evidence in the record provides reasonable justification for the ruling.
*298 In Ex parte Personnel Board of Jefferson County, this court stated the standard of review of a personnel-board action:
"In general, the review by a court of any Personnel Board action is extremely limited. Templin v. City Commission, 279 Ala. 473, 187 So.2d 230 (1966). The determination of the weight and credibility of the evidence presented is solely within the province of the Board; the review here is limited to the proper application of the relevant law and whether the Board's ruling is supported by any legal evidence. Id. This narrow scope of appellate review is in keeping with the general principles underlying certain important doctrines in administrative law which come into play when judicial review of administrative actions is involved. See generally Fraternal Order of Police, Strawberry Lodge # 40 v. Entrekin, 294 Ala. 201, 314 So.2d 663 (1975) (exhaustion and primary jurisdiction doctrines).
"... When the legislature delegates a discretionary function to an agency to be exercised in light of the agency's special competency, a court frustrates legislative intent and usurps that discretionary role by stepping in when the agency's choice is not clearly unreasonable or arbitrary. See State ex rel. Steele v. Board of Education, 252 Ala. 254, 40 So.2d 689 (1949)."
440 So.2d at 1109. To disregard the Personnel Board's factual findings would be to disregard the mandatory obligation of our courts to defer to the Personnel Board's "determination of the weight and credibility of the evidence presented." Id. An appellate court's role in this case is limited to determining whether legal evidence supports the Personnel Board's factual determinations and whether the Personnel Board's decision is reasonable and not arbitrary.
The Irondale Use of Force Policy authorizes the use of force against a "violently resisting" inmate and to maintain control in the jail. The policy states: "An officer will only use the amount of force that is necessary to bring a situation under control" under the totality of the circumstances. The term excessive force generally refers to "[u]nreasonable or unnecessary force under the circumstances." Black's Law Dictionary 760 (10th ed. 2014). Testimony before the Personnel Board presented conflicting evidence regarding the allegation of the use of excessive force by Key. Depending upon the weight and credibility assigned to the testimony, sufficient evidence was available to support either a finding that Key used excessive force against the inmate or a finding that his use of force was reasonable and necessary. In its order, the Personnel Board specifically found that "the actions of Respondent Key were necessary to further restrain the prisoner, who subsequent to being restrained, continued to engage in conduct that could be deemed disruptive and could have potentially endangered the officers present." Because the Personnel Board's finding that Key's use of force was necessary is supported by legal evidence, we defer to the Personnel Board as to that finding; therefore, we review the order only to determine whether it was reasonable and not arbitrary.
Black's Law Dictionary 125 (10th ed. 2014) defines arbitrary as "1. Depending on individual discretion; of, relating to, or involving a determination made without consideration of or regard for facts, circumstances, fixed rules, or procedures. 2. (Of a judicial decision) founded on prejudice or preference rather than on reason or fact." " ' "A determination is not 'arbitrary' or 'unreasonable' where there is a reasonable justification for its decision or where its determination is founded upon adequate principles or fixed standards." ' "
*299 Phase II, LLC v. City of Huntsville, 952 So.2d 1115, 1119 (Ala. 2006) (quoting City of Huntsville v. Smartt, 409 So.2d 1353, 1357-58 (Ala. 1982), quoting in turn Hughes v. Jefferson Cty. Bd. of Educ., 370 So.2d 1034, 1037 (Ala. Civ. App. 1979) ).
The basis of the charges against Key was the allegation of the use of excessive force. Because the Personnel Board's factual finding determined that Key's use of force was necessary, the Personnel Board lacked a reasonable justification for its order suspending Key without pay. We note that Key was also charged with use of a Taser weapon without certification. The Personnel Board, however, did not make a finding regarding that charge, and the hearing officer found Key's alleged uncertified use of a Taser weapon to be insignificant. Because the Personnel Board did not rely on that charge as a basis for its order, that charge and any evidence in support of it could not provide a basis for affirming that order. See Ex parte Personnel Bd. of Jefferson Cty., 440 So.2d at 1109 ("[T]he effect of the legislature's delegation of Jefferson County personnel decisions to the Jefferson County Personnel Board could be undermined if a reviewing court were allowed to uphold disciplinary actions on the basis of charges presented to but not passed upon the Board itself.").
For the foregoing reasons, we reverse the circuit court's judgment and remand the cause for proceedings consistent with this opinion.
REVERSED AND REMANDED.
Thomas, Moore, and Donaldson, JJ., concur.
Pittman, J., dissents, with writing, which Thompson, P.J., joins.

Rule 12.5(b) of the Jefferson County Personnel Board Rules and Regulations provides:
"Conduct of Hearing by Hearing Officer. The hearing shall be before a Hearing Officer appointed by the Board. The Hearing Officer shall take testimony and other evidence offered in support and denial of such charges. Within five (5) Business Days of the close of the hearing, the Hearing Officer shall submit a Report and Recommendation to the Board, which shall contain findings of fact and conclusions therefrom upon all material issues presented at the hearing."

See Act No. 248, Ala. Acts 1945, as amended by Act No. 562, Ala. Acts 1947, Act No. 927, Ala. Acts 1953, and Act No. 679 and Act No. 684, Ala. Acts 1977.

Although the parties reference Rule 39, Ala. R. App. P., that rule regarding petitions for a writ of certiorari to our supreme court does not apply to a common-law petition for a writ of certiorari to this court. Ex parte Smith, 394 So.2d 45, 48 (Ala. Civ. App. 1981).